**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| HUGUES GERVAT, derivatively on behalf of ADOBE INC., | |
| Plaintiff, | **Case No. :** |
| v. | **JURY TRIAL DEMANDED** |
| SHANTANU NARAYEN, AMY BANSE, BRETT BIGGS, MELANIE BOULDEN, FRANK CALDERONI, LAURA DESMOND, SPENCER NEUMANN, KATHLEEN OBERG, DHEERAJ PANDEY, DAVE RICKS, DAN ROSENSWEIG, DANIEL DURN, DAVID WADHWANI, JOHN MURPHY, and JONATHAN VAAS, | |
| Defendants, | |
| and | |
| ADOBE INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Hugues Gervat ("Plaintiff"), by and through his undersigned attorneys, derivatively and on behalf of Nominal Defendant Adobe Inc. ("Adobe" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Shantanu Narayen ("Narayen"), Amy Banse ("Banse"), Brett Biggs ("Biggs"), Melanie Boulden ("Boulden"), Frank Calderoni ("Calderoni"), Laura Desmond ("Desmond"), Spencer Neumann ("Neumann"), Kathleen Oberg ("Oberg"), Dheeraj Pandey ("Pandey"), Dave Ricks ("Ricks"), Dan Rosensweig ("Rosensweig"), Daniel Durn ("Durn"), David Wadhwani ("Wadhwani"), John Murphy ("Murphy"), and Jonathan Vaas ("Vaas") (collectively, the "Individual Defendants" and together

1

with Adobe, "Defendants"), for breach of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Adobe's publicly available documents, including the complaint filed in the securities class action captioned *Pembroke Pines Firefighters & Police Officers Pension Fund, et al v. Adobe, Inc. et al.* Civ. Act. No. 1:23-cv-09260 (S.D.N.Y. Oct 20, 2023) (the "Securities Class Action"), conference call transcripts and announcements, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Adobe, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Adobe against certain current and former officers and members of the Company's Board of Directors (the "Board") for, among other things, their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct, which occurred between July 23, 2021 and September 15, 2022, inclusive (the "Relevant Period").

2.      Adobe is a software technology company that describes itself as offering "groundbreaking technology." The Company offers a suite of applications and services for various uses in design, as well as document, video, and photo editing. Adobe operates primarily on a subscription model, selling access to its applications for a monthly fee, in addition to offering cloud-based "software-as-a-service" subscriptions.

3.     Throughout the Relevant Period, the Company and its top executives repeatedly downplayed competition from companies such as Figma, which offers a web application allowing multiple users to view and edit user interfaces, and misleadingly suggested that Adobe's existing offerings, including its "Express" application, were adequate to counter any harms the Company may have otherwise faced due to Figma's growing market position. The Company also concealed that its own user-interface design app, "XD," was failing to gain traction with customers.

4.     Contrary to Defendants' representations, Figma had exhibited rapid growth and reached a $10 billion valuation in June 2021 – up from $2 billion in April 2020. Adobe and the Individual Defendants issued statements that cast Figma, and companies like it, as merely "point solution providers" and "single product compan[ies] that[] found a niche with a growing universe of users[,]" rather than as major competitors.

5.     Despite these assurances, however, on September 15, 2022, Adobe announced that it would acquire Figma for $20 billion (the "Acquisition") – a multiple of 50 times Figma's revenues.

6.     Credit Suisse observed that the price of the Acquisition represented the highest revenue multiple ever paid for a scaled software-as-a-service company. John Naughton, senior research analyst with the Centre for Research in the Arts, Social Sciences and Humanities at the University of Cambridge, claimed in an article in *The Guardian* challenging the Acquisition that the $20 billion price tag was "way above any rational valuation of Figma[,]" and Adobe's leaders "are thinking ahead and they see a strategic threat in the making." Another veteran analyst claimed that "in the long run Adobe has to operate on Figma's terms, not the other way around; to put it another way, Adobe is not only paying for long-run control of design but also its own

independence." On this news, the price of Adobe's common stock plummeted nearly 17% in one day.

7.      On August 7, 2023, the United Kingdom's Competition & Markets Authority (the "CMA") published a report (the "CMA Report") confirming that Adobe viewed Figma as a competitive threat throughout the Relevant Period. The CMA Report also explained that, by October 2021, Adobe removed more than one hundred positions from Adobe XD, and in February 2022 it placed XD into "maintenance mode," for products that eventually became phased out. The CMA Report further noted that "Adobe's internal documents regularly reference competing with Figma and compare planned features to those offered by Figma."

8.      As detailed herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants made or caused Adobe to make false and misleading statements, and omitted material facts, in that: (1) Figma was growing its market share and was becoming a leader in user experience design; (2) Figma was in direct competition with Adobe on user experience design; (3) Adobe's "Express" product was not an effective counter to Figma's growing market share in bringing new customers to Adobe's paid offerings; (4) Adobe's other offerings were not succeeding in competing with Figma on user experience design; and (5) Adobe was losing market share to Figma. As a result, the Individual Defendants caused Adobe's public statements to be materially false and misleading at all relevant times.

9.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

10.      The Individual Defendants' misconduct resulted in the commencement of the

Securities Class Action against Adobe, Chairman and Chief Executive Officer ("CEO") Narayen, former Chief Financial Officer ("CFO") Murphy, current CFO Durn, President of Adobe's Digital Media segment, Wadhwani, and Adobe's Vice President of Investor Relations, Vaas. The Securities Class Action has further subjected the Company to the need to undertake internal investigations and implement adequate internal controls – Adobe will have to expend significant sums of money.

11.     Adobe has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct. As a result of the Individual Defendants' wrongful acts and omissions and breaches of fiduciary duties, the filing of the Securities Class Action, and the decline in the market value of the Company's securities, Adobe has suffered significant losses and damages.

12.     Plaintiff did not make a demand prior to bringing this action because it would be futile. Adobe's directors are neither disinterested nor independent. In the absence of this action, Adobe will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC, as they assert a federal question.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This action is not a collusive action designed to confer jurisdiction on a court of the

United States that it would not otherwise have.

16.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Adobe is incorporated in this District as well as conducts business in this District and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District.

## PARTIES

18.    Plaintiff is, and has been at all relevant times, a shareholder of Adobe.

19.    Nominal Defendant Adobe is incorporated under the laws of Delaware, with its principal executive offices located at 345 Park Avenue, San Jose, California 95110. Adobe's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "ADBE."

20.    Defendant Narayen has served as the Company's CEO and as a member of the Board since December 2007. Narayen has been the Chairman of the Board since January 2017. As set forth in the proxy statement Adobe filed with the SEC on March 3, 2023 (the "2023 Proxy Statement"), Narayen received $31,600,311 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Narayen beneficially owned 437,383 shares of Adobe's common stock as of February 21, 2023.

21.    Defendant Banse has served as a member of the Board since May 2012. Defendant Banse also serves as Chair of the Executive Compensation Committee and as a member of the Governance and Sustainability Committee. As set forth in the 2023 Proxy, Banse received

$382,536 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Banse beneficially owned 32,699 shares of Adobe's common stock as of February 21, 2023.

22.     Defendant Biggs has served as a member of the Board since October 2020. Defendant Biggs also serves as a member of the Audit Committee. As set forth in the 2023 Proxy Statement, Biggs received $420,195 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Biggs beneficially owned 1,009 shares of Adobe's common stock as of February 21, 2023.

23.     Defendant Boulden has served as a member of the Board since January 2022. Defendant Boulden also serves as a member of the Executive Compensation Committee. As set forth in the 2023 Proxy Statement, Boulden received $357,536 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Boulden beneficially owned 1,596 shares of Adobe's common stock as of February 21, 2023.

24.     Defendant Calderoni has served as a member of the Board since May 2012 and has served as Lead Director since 2020. Defendant Calderoni also serves as Chair of the Governance and Sustainability Committee. As set forth in the 2023 Proxy Statement, Calderoni received $412,536 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Calderoni beneficially owned 30,348 shares of Adobe's common stock as of February 21, 2023.

25.     Defendant Desmond has served as a member of the Board since May 2012. Defendant Desmond also serves as a member of the Executive Compensation Committee. As set forth in the 2023 Proxy Statement, Desmond received $357,536 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Desmond beneficially owned 30,266 shares of Adobe's common stock as of February 21, 2023.

26.     Defendant Neumann has served as a member of the Board since January 2022. Defendant Neumann also serves as a member of the Audit Committee. As set forth in the 2023 Proxy Statement, Neumann received $420,195 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Neumann beneficially owned 919 shares of Adobe's common stock as of February 21, 2023.

27.     Defendant Oberg has served as a member of the Board since January 2019. Defendant Oberg also serves as Chair of the Audit Committee and as a member of the Governance and Sustainability Committee. As set forth in the 2023 Proxy Statement, Oberg received $392,536 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Oberg beneficially owned 2,881 shares of Adobe's common stock as of February 21, 2023.

28.     Defendant Pandey has served as a member of the Board since January 2019. Defendant Pandey also serves as a member of the Audit Committee. As set forth in the 2023 Proxy Statement, Pandey received $362,536 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Pandey beneficially owned 3,551 shares of Adobe's common stock as of February 21, 2023.

29.     Defendant Ricks has served as a member of the Board since April 2018. Defendant Ricks also serves as a member of the Executive Compensation Committee. As set forth in the 2023 Proxy Statement, Ricks received $357,536 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Ricks beneficially owned 5,811 shares of Adobe's common stock as of February 21, 2023.

30.     Defendant Rosensweig has served as a member of the Board since January 2009. Defendant Rosensweig also serves as a member of the Governance and Sustainability Committee. As set forth in the 2023 Proxy Statement, Rosensweig received $353,663 in compensation from

the Company in 2022. According to the 2023 Proxy Statement, Rosensweig beneficially owned 17,565 shares of Adobe's common stock as of February 21, 2023.

31.     Defendant Durn has served as Adobe's CFO since October 18, 2021. As set forth in the 2023 Proxy Statement, Durn received $13,289,714 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Durn beneficially owned 14,876 shares of Adobe's common stock as of February 21, 2023.

32.     Defendant Wadhwani serves as the President of Adobe's Digital Media reporting segment, after having been appointed as Executive Vice President and Chief Business Officer of Digital Media in June 2021. As set forth in the 2023 Proxy Statement, Wadhwani received $11,649,015 in compensation from the Company in 2022. According to the 2023 Proxy Statement, Wadhwani beneficially owned 10,717 shares of Adobe's common stock as of February 21, 2023.

33.     Defendant Murphy served as Adobe's CFO from April 2018 until October 18, 2021.

34.     Defendant Vaas serves as the Company's Vice President of Investor Relations.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

35.     By reason of their positions as officers and/or directors of Adobe, and because of their ability to control the business and corporate affairs of Adobe, the Individual Defendants owed Adobe and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Adobe in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Adobe and its shareholders so as to benefit all shareholders equally.

36.     Each director and officer of the Company owes to Adobe and its shareholders the

fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Adobe, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

38.     To discharge their duties, the officers and directors of Adobe were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

39.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Adobe, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

40.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

41.     To discharge their duties, the officers and directors of Adobe were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Adobe were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Adobe's own Code of Ethics and Code of Business Conduct (together, the "Codes of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Adobe conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Adobe and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)        maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Adobe's operations would comply with all applicable laws and Adobe's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)        exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)        refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)        examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

42.     Each of the Individual Defendants further owed to Adobe and the shareholders the duty of loyalty requiring that each favor Adobe's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

43.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Adobe and were at all times acting within the course and scope of such agency.

44.     Because of their advisory, executive, managerial, and directorial positions with Adobe, each of the Individual Defendants had access to adverse, non-public information about the Company.

45.     The Individual Defendants, because of their positions of control and authority, were

able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Adobe.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

48.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Adobe purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

49.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Adobe, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

50.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially

assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

51.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Defendants and of Adobe and at all times acted within the course and scope of such agency.

## THE CODE OF BUSINESS CONDUCT

52.   Adobe maintains a Code of Business Conduct that opens with a letter from CEO Narayen stating that Adobe's "commitment to operating with the highest ethical standards have remained constant." Narayen adds that the Code of Business Conduct "outlines the principles that guide our interactions with employees, customers, partners, stockholders, and communities[,]" and that the Company "strive[s] to communicate openly and honestly, to act fairly and responsibly[.]"

53.   The Code of Business Conduct contains a section titled, "Ensuring Proper Use of Adobe's Assets," which states:

> We expect all personnel to protect Adobe's assets and use company resources only to perform legitimate business functions (and for reasonable personal purposes, as allowed by Adobe's policies). This means you may not use Adobe's assets for any function that you are not authorized to perform, for any illegal purpose, or for any matter that violates the letter or spirit of this Code or other Adobe policies.

54.   In a section titled "Maintaining Accurate Books and Records," the Code of Business Conduct provides, in relevant part:

> It is a violation of this Code and our company policies to intentionally omit, hide, or disguise the nature of any transaction or liability in Adobe's books and records. Falsification of business documents, whether or not it results in personal or commercial gain, is never permitted and may result in termination of your employment or business relationship with Adobe. Cash or other assets may never be maintained for any purpose in any unrecorded or "off-the-books" accounts.

55.   In a section titled "Financial Reporting," the Code of Business Conduct states, in relevant part:

Adobe is required by law to file public reports and communications with the U.S. Securities and Exchange Commission (the "SEC"), and with other governmental bodies around the world, that provide full, accurate, and understandable disclosure of our financial condition and results of our business operations. Adobe relies on its financial records and other business records in preparing these reports. We follow U.S. generally accepted accounting principles to produce our financial records.

Adobe's financial disclosures must be accurate and transparent and reflect the high quality and integrity of our accounting practices and records. Anyone who contributes to preparing or verifying these SEC reports is responsible for ensuring that the reports contain all relevant and important information to enable stockholders and potential investors to assess the soundness and risks of our business and finances.

Your full cooperation with any investigation or review is expected to help ensure that Adobe's books and records, as well as our financial reports filed with the SEC (or filed with other governmental bodies, such as with respect to Adobe's subsidiaries worldwide), are accurate and complete.

You must never:

- Take any action that would cause our financial records or financial disclosures to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC, or any other applicable laws.

- Knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of Adobe's reports filed with the SEC or any other governmental bodies.

- Knowingly omit (or cause or encourage any other person to omit) any information that is necessary to make Adobe's financial reports accurate in all material respects.

- Coerce, manipulate, mislead, or fraudulently influence (or cause or encourage any other person to coerce, manipulate, mislead, or fraudulently influence) Adobe's independent public accountants if you know or should have known that such actions could make our financial reports misleading.

- To highlight how important these standards are to Adobe, our Senior Officers are also bound by a separate Code of Ethics in addition to this Code. These employees of Adobe have a special role that requires both adhering to this Code and ensuring that Adobe has a culture of integrity that promotes fair, accurate, and timely reporting of our financial results and condition.

## THE CODE OF ETHICS

56.     Adobe also maintains a Code of Ethics that states that the purpose of Adobe's policy is to prevent wrongdoing and promote, among other things: (i) honest and ethical conduct; (ii) full, fair, accurate, timely and understandable disclosure; and (iii) compliance with governmental laws, rules and regulations.

57.     With respect to accurate disclosures, the Code of Ethics states that senior officers "must provide, or cause to be provided, full, fair, accurate, timely and understandable disclosure in reports and documents that Adobe files with, or submits to, the Securities and Exchange Commission, and in other public communications made by Adobe."

## THE AUDIT COMMITTEE CHARTER

58.     Adobe's Audit Committee Charter states that the primary purpose of the Audit Committee is to assist the Board in fulfilling its responsibilities to oversee management's financial, accounting and reporting processes, the Company's system of internal accounting and financial controls, the Company's enterprise risk management program and the Company's compliance with related legal, regulatory and ethical requirements. Furthermore, the Audit Committee Charter states that the Audit Committee shall prepare any reports required by the Committee under rules of the SEC and regularly report its activities to the Board.

59.     Regarding the Audit Committee's responsibilities concerning review of charter, financial reporting, policies and practices, the Audit Committee Charter states that the Audit Committee shall, among other things:

> Review and discuss with management and the Independent Auditor the Company's annual audited and quarterly financial statements, including the effect of regulatory and accounting initiatives, and any certification, report, opinion or review rendered by the Independent Auditor, and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

Review and discuss with management and the Independent Auditor the Company's disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" appearing in the Company's annual report on Form 10-K and quarterly report on Form 10-Q.

Review with management and the Independent Auditor any significant judgments and estimates made by management in the preparation of the financial statements and the view of each as to appropriateness of such judgments and estimates, and any material audit adjustments proposed by the Independent Auditor and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Independent Auditor under the standards of the PCAOB.

Review and discuss with management, the chief internal auditor and the Independent Auditor, prior to public dissemination, the annual internal control report of management and the Independent Auditor's attestation/opinion letter as required by applicable law and rules.

Review quarterly with management its evaluation of the Company's procedures and controls designed to ensure that information required to be disclosed in its periodic public reports is recorded, processed, summarized and reported in such reports within the time periods specified by the SEC for the filing of such reports ("Disclosure Controls"), and consider whether any changes are appropriate in light of management's evaluation of the effectiveness of such Disclosure Controls.

Review with management and the Independent Auditor, as appropriate, earnings press releases.

60.     In regards to enterprise risk management, internal audit, legal compliance, and ethics responsibilities, the Audit Committee Charter states that the Audit Committee's shall, among other things:

Review and oversee the Company's key enterprise risk exposures and the steps taken by management to monitor and mitigate these exposures.

*       *       *

Review with the principal executive and financial officers of the Company any report on significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data, any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

17

Review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and regulations.

Ensure the establishment of and periodically review procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters. Adopt, as necessary, appropriate remedial measures or actions with respect to such complaints or concerns.

Review the code of ethics for senior officers, and ensure prompt disclosure to the public, as required by applicable law or regulation, of such code of ethics and of any change in, or waiver of, such code of ethics.

Prepare the Committee's report required by the rules of the SEC to be included in the Company's annual report on Form 10-K.

*       *       *

Review periodically with the general counsel legal and regulatory matters that could have a material impact on the Company's financial statements or compliance policies, including any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

Investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

Periodically recommend to the Board that either the full Board or its committees oversee and review relevant elements of the Company's enterprise risk management program (including elements related to information and technology security and cybersecurity), oversee and review those elements of the program assigned to the Committee and monitor the quality of the program's implementation and execution.

## SUBSTANTIVE ALLEGATIONS

**Materially False and Misleading Statements Issued During the Relevant Period**

61.     The Relevant Period begins on July 23, 2021, when, at a public investor question-and-answer session hosted by Scotiabank, Defendant Vaas stated:

*For the creative business, there's not a competitor, a single competitor that has anything approaching the set of content creation apps across all of these different categories and media types that we have.* So the answer to the question will be kind of drilling down into the particular point products and asking what are the other alternatives there.

I think of -- in a general way, I would say if you look at competition in terms of every photograph that's taken in the world and how that photograph is edited, there's an ecosystem of free tools that people can use, and that kind of gets them started. That gets them interested in being content creators. And those are -- from simple cropping and editing apps that are within an iPhone, for example, or simple editing apps that are on some web-based platforms.

But once they're interested in being able to do more and take their content creation to the next level, they come to Adobe. Other competitors that monetize the tools -- so one place that we played in for years is the video editing space. That's one where Adobe Premiere is the clear leader. Apple has been a competitor with a final product, not as much in the Pro segment anymore, but in the Hobbyist segment.

\*       \*       \*

In terms of -- a newer category is experience design. We think experience-led thinking, experience design product development is a paradigm that's going to continue to grow that category. And that's a newer category where there's some other point solution providers, like InVision and Sketch and Figma. I could go on and on. *But effectively, in that business, a few of our products tend to have a few point players that compete with us. But end-to-end, there's not really a major competitor.*[1]

62.      On September 29, 2021, Adobe filed its quarterly report for the period ended

September 3, 2021, on Form 10-Q (the "September 2021 10-Q") with the SEC, which discussed

the Company's competition in relevant part:

*Our competitive position and results of operations could be harmed if we do not compete effectively.*

The markets for our products and services are characterized by intense competition, new industry standards, evolving distribution models, limited barriers to entry, disruptive technology developments, short product life cycles, customer price sensitivity, global market conditions and frequent product introductions (including alternatives with limited functionality available at lower costs or free of charge). Any of these factors could create downward pressure on pricing and gross margins

---

[1] Unless otherwise noted, all emphasis added.

and could adversely affect our renewal and upsell and cross-sell rates, as well as our ability to attract new customers. Our future success will depend on our continued ability to enhance and integrate our existing products and services, introduce new products and services in a timely and cost effective manner, meet changing customer expectations and needs, extend our core technology into new applications, and anticipate emerging standards, business models, software delivery methods and other technological developments. Furthermore, some of our competitors and potential competitors enjoy competitive advantages such as greater financial, technical, sales, marketing and other resources, broader brand awareness and access to larger customer bases. As a result of these advantages, potential and current customers might select the products and services of our competitors, causing a loss of our market share. In addition, consolidation has occurred among some of our competitors. Further consolidations in these markets may subject us to increased competitive pressures and may harm our results of operations.

*     *     *

***If we cannot continue to develop, acquire, market and offer new products and services or enhancements to existing products and services that meet customer requirements, our operating results could suffer.***

63.    The September 2021 10-Q included certifications signed by Defendants Narayen and Murphy asserting that the September 2021 10-Q did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" by the September 2021 10-Q.

64.    On January 5, 2022, at an event hosted by Evercore ISI, Defendant Vaas discussed competition from Figma in the following exchange:

[Analyst:] When you think about Canva or Figma, how do you -- how should investors sort of frame that? I mean, like, to me, they seem like market expander, sort of they're helping you all expand the market. I don't get the sense that these are competitors and sort of the enterprise or even the sort of group part of your business. . . .

Vaas: Yes. I think there's definitely -- when you look overall in the ecosystem in software, there are some things that other companies are doing that validate the explosiveness of these markets that we're competing in, right? And if you look at the TAM for Creative, that -- it's built up of Creative professionals where we said that's growing to $25 billion by 2024. That shows you how much runway there is

20

just in that top end of the Creative professional market.

In the communicators bucket, that's growing now to north of $30 billion, and that's due to a number of things, but a lot of knowledge workers -- and like I said, people that just aren't expert in creativity, but have a story to tell, they're turning to creative tools rather than maybe -- they might have turned up to something like PowerPoint before for office presentations. And there are other companies that are expanding the market and kind of validating the enthusiasm and the spending potential for people that want to create content is very real out there.

I think until Creative Cloud Express was launched, we saw -- it was definitely more of a complementary situation where we would see people start out on simpler tools. And then when they're ready to do more and advance to high-fidelity content creation, they'd come over to Adobe. We've seen that since Microsoft Paint. We've seen that with simple content editors in social media platforms and on phones and some of these start-ups out there in the world.

I think with Creative Cloud Express, Adobe is making more of a strategic decision now to take all of the science that we've built and go down market and really compete, not just be the place they turn to when they're ready to do more, but the place they learn and start as well. And then we're building bridges from the point of entry, making it extremely simple to get started, all the way through much more complex creation like with Video and Premier and After Effects.

65.    Again downplaying Adobe's competition just days later, on January 11, 2022, at an

event hosted by Bank of America, Defendant Vaas stated, in part:

[Analyst:] There's some high-profile private companies facing capital at high valuations, Canva and Figma. Have you seen these 2 offerings in the marketplace? When you think about the competitive landscape here, what are Adobe's strengths general? And maybe specific to those 2, how do you see those 2?

Vaas: Sure. Yes. When you look at a $63 billion TAM, I think more than any other company, that's Adobe's opportunity. There are definitely other point solution players, who have, I think, had a role in expanding that TAM as we see millions of new people really interested in content creation. Certainly, some other companies validating the secular tailwinds that are driving expansion in that market. ***I would say almost to the company that I could think about, everyone else we see as a point solution provider***. They're a single product company that's found a niche with a growing universe of users. And there's some companies that have good momentum in that space.

*      *      *

With Creative Cloud Express, you can see that we now have democratized our own tools to the level that we want people to get started and begin their journey with Adobe. ***And the big differentiation from us, this applies, you mentioned Figma, any other company, there are some competitors in video editing, for example. But they're all point solutions***.

***Whereas we have this cloud connected collaborative system of applications that all work together and we say creativity is a multiplayer sport***. And from the file types they use, to color templates and fonts, we have it all connected together in a way where there's bridges we build between creators and journeys for people to break out of simple templates and do more and do more.

***And so I don't see a competitor that sort of has anything approaching that end-to-end strategic position that Adobe does, but there's definitely other companies that are seeing the global enthusiasm around content creation. And I think overall, that's a good thing for Adobe and it's a good thing for the expanding market.***

66.     On January 20, 2022, Defendant Wadhwani spoke at an industry event hosted by

Wolfe Research, discussing Adobe's competition, stating in part:

[Analyst]: [L]et's go with where the video kind of ended, which is Creative Cloud Express creativity for everyone and the #1 question I get, and I'm sure Mr. Vaas gets from most investors right now, particularly in light of the last quarter, really the second half of last year, what about the competition? What about Canva and Figma? And aren't they -- for the first time -- not for the first time, the first time in recent memory Adobe has real competition, and they're taking share. So let's talk about the key elements. Both of you, VC backgrounds, not that long ago, saw these companies in the markets. What is the competitive environment? What is the answer? If it's an answer or if let's say an opportunity? I want both of you individually to address this topic because I think it's one that's near and dear to investor hearts.

Wadhwani: Yes…so at a high level, I think you have to look at, first of all, look at just the fundamentals of Adobe's business. I mean we ended last year with adding almost $2 billion of net new ARR. So clearly, the foundation and the tailwind that's been driving us is there and has been consistently there for a long time.

Secondly, we guided our highest guide ever for FY '22 in the digital media business. And that's the foundation of how we think about where we're going. It's very consistent with the kinds of guides we've given historically and it gives you a sense of where we're going now. Some of this, I think it's worth just sort of addressing directly comes from questions that we've had in the second half of the year and associated with sort of how people are interpreting the results we had. And there is some episodic activity that is harder to predict with the pandemic. We've

talked a bunch about in the past things associated with summer travel. We've talked about sort of some changes in terms of holiday season buying behavior. But those are 2 episodic events that when you look at it in the context of the performance last year and you look at the -- in the context of the guide, really underscores how confident we are about the market opportunity ahead, right?

We also talked about recently how we're thinking about the market, which is different than what we've thought about before. We really look at the creative professional market as one that's accelerating and growing very quickly. We see this new creator economy for communicators coming out, and we said that's about a $30 billion, $34 billion market, I believe we said. And we have a Document Cloud business that's also playing into this big TAM. You add all that together, you have a $100 billion TAM that we're going after.

Now as a company like Adobe historically was playing in a smaller TAM and had a very large presence in that TAM. As this TAM explodes, you should expect to see some competition participating in parts of that TAM. ***The surface area is so significant, we should expect to see other entrants playing in and around similar areas. But I'm going to go back to where Scott was leaving off. If you think about it in that context of the professional base, when you look at the fact that there are more creative pros needed in companies than ever before, that's obviously a big tailwind for us.***

67.     On January 21, 2022, Adobe filed its annual report on Form 10-K for the fiscal year ended December 3, 2021 (the "2022 10-K") with the SEC. The 2022 10-K contained substantially the same statements about competition as the September 2021 10-Q, as set forth above.

68.     The 2022 10-K was signed by Defendants Narayen, Durn, Banse, Biggs, Boulden, Calderoni, Desmond, Neumann, Oberg, Pandey, Ricks, and Rosensweig. The 2022 10-K also included signed certifications by Defendants Narayen and Durn asserting that the 2022 10-K did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" by the 2022 10-K.

69.     On March 30, 2022, the Company filed its quarterly report for the period ended March 4, 2022, on Form 10-Q with the SEC (the "March 2022 10-Q") containing substantially the

same statements about competition as the September 2021 10-Q, as set forth above. The March 2022 10-Q also included signed certifications by Defendants Narayen and Durn asserting that the March 2022 10-Q did not contain "any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" by the March 2022 10-Q.

70.   On June 16, 2022, Adobe hosted an earnings call with analysts and investors, during which Defendant Wadhwani stated:

> Where we see Express filling in is that Express is additive and broadens the reach in that new communicator base because of exactly what you're saying, the freemium business model, the zero-friction onboarding. It's clearly showing that we're able to attract millions of new users into the franchise. And we're able to do it very efficiently by optimizing how we onboard customers from search terms that typically were not ones that we focused on in the past. We also look at the ability to onboard those users and differentiate the offering with the integration of these amazing features that we get from the desktop applications like Adobe Magic. And all of this helps differentiate what we're doing with Express. And if we take a step back and look at it from a business perspective, we feel very confident that Adobe Express and the way we actually pull people into that funnel is additive to the market opportunity that we're playing. So we are really emphasizing the ability to add more capabilities there and differentiate there.

> I do also want to remind folks that Express is also available to core Creative Cloud customers. And by integrating some of those features into Express, we're enabling workflows between the core Creative Cloud products and also Express, and we believe that's going to have a strong retentive value on the core base. And we just had, in fact, a great quarter with very strong retention for Creative Cloud as well.

71.   On June 30, 2022, the Company filed its quarterly report for the quarter ended June 4, 2022, on Form 10-Q with the SEC (the "June 2022 10-Q") containing substantially the same statements about competition as the September 2021 10-Q, as set forth above. The June 2022 10-Q also included certifications signed by Defendants Narayen and Durn asserting that the June 2022 10-Q did not contain "any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered" by the June 2022 10-Q.

72.     The statements detailed above were false and misleading, and omitted material facts, in that: (1) Figma was growing its market share and was becoming a leader in user experience design; (2) Figma was in direct competition with Adobe on user experience design; (3) Adobe's "Express" product was not an effective counter to Figma's growing market share in bringing new customers to Adobe's paid offerings; (4) Adobe's other offerings were not succeeding in competing with Figma on user experience design; and (5) Adobe was losing market share to Figma.

**The Truth Emerges**

73.     On September 15, 2022, the truth emerged when Adobe announced that it had entered into an agreement with Figma for the Acquisition whereby Adobe would acquire Figma for $20 billion in cash and stock.

74.     In an article published the same day, entitled "Adobe shares plunge on deal to acquire design platform Figma for $20 billion," *CNBC* reported that Adobe was paying "in the neighborhood of 50 times revenue at a time when sales multiples for cloud software are contracting dramatically from their record highs reached last year." Analyst Evercore wrote in a report the same day that Adobe was evidently "losing some momentum to Figma and it was better to buy them out and combine forces" than to allow Figma "to create a bigger beachhead in the enterprise." Credit Suisse observed in its own report that the deal was priced so high, it represented the highest revenue multiple ever paid for a scaled software-as-a-service company.

75.     On this news, the price of Adobe stock fell $62.39 per share, or nearly 17%, from a close of $371.52 per share on September 14, 2022, to close at $309.13 on September 15, 2022 – resulting in a $28.9 billion decline in market cap.

76.     On August 7, 2023, the CMA issued the CMA Report confirming that Adobe viewed Figma as a competitive threat throughout the Relevant Period and that at the same time its own user-interface design product was a failure. Specifically, the report indicated that Figma competed directly with Adobe XD, is a market leader in design software, and is several times larger than any other supplier of "all-in-one" screen design software.

77.     The CMA Report found that Adobe shifted resources out of XD in favor of a new tool that, according to internal documents, encompassed a range of functionalities designed to compete directly with Figma and that Adobe had a large team of engineers working on the development of this tool until it was cancelled shortly before the announcement of the Acquisition. The CMA Report further noted that "Adobe's internal documents regularly reference competing with Figma and compare planned features to those offered by Figma." As a result, the CMA Report determined Figma and Adobe to be "close competitors" in all-in-one screen design and that this competition would be lost as a result of the Acquisition.

## DAMAGES TO ADOBE

78.     As a direct and proximate result of the Individual Defendants' misconduct, Adobe has expended, and will lose and expend, significant sums of money.

79.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

80.     Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

81.     Such losses also include, but are not limited to, significant compensation and

benefits paid to the Individual Defendants who breached their fiduciary duties to Adobe, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

82.     As a direct and proximate result of the Individual Defendants' conduct, Adobe has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## PLAINTIFF'S DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

83.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

84.     Adobe is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

85.     Plaintiff is an owner of Adobe common stock and has been a continuous shareholder of Adobe stock at all relevant times.

86.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

87.     A pre-suit demand on Adobe's Board is futile and, therefore, excused. At the time this action was commenced, the twelve-member Board consisted of Individual Defendants Narayen, Banse, Biggs, Boulden, Calderoni, Desmond, Neumann, Oberg, Pandey, Ricks, and Rosensweig (the "Director Defendants") as well as non-party Cristiano Amon. Plaintiff needs only to allege demand futility as to six of the twelve members of the Board at the time of the filing of

this complaint.

88.     As set forth below, the Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

89.     The acts complained of herein constitute violations of fiduciary duties owed by Adobe's officers and directors, and these acts are incapable of ratification.

90.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

91.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

92.     Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

93.     All eleven of the Director Defendants signed the 2022 10-K, while Director Defendant Narayen also provided certifications with the September 2021, March 2022, and June 2022 10-Qs that those reports did not contain "any untrue statement of a material fact or omit to

state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered." Accordingly, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

94.     Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

95.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

96.     Additionally, the Director Defendants took no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

97.     Defendants Oberg, Biggs, Neumann, and Pandey (the "Audit Defendants") serve on Adobe's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding Adobe's business, finances, and operations as alleged

above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

98.     The Director Defendants, as members of the Board, were and are subject to the Company's Codes of Conduct. The Codes of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Codes of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Codes of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

99.     Moreover, the Director Defendants have taken no remedial action to redress the conduct alleged herein.

## **FIRST CLAIM**

### **Against the Individual Defendants for Violations of § 10(b)**
### **of the Exchange Act and Rule 10b-5**

100.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

101.    The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

102.    The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading.

103.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

104.    The Individual Defendants acted with scienter because they: (i) knew that the public documents and statements issued or disseminated in the name of Adobe were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

105.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Adobe, their control over, and/or receipt and/or modification of Adobe's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Adobe, participated in the fraudulent scheme alleged herein.

106.    As a result of the foregoing, the market price of Adobe common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Adobe common stock in purchasing Adobe common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

107.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Class Action and reputational harm. The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

## SECOND CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    The Individual Defendants owe Adobe fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

110.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

111.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent

business judgment to protect and promote the Company's corporate interests.

112.    Specifically, the Individual Defendants made or caused the Company to make false and misleading statements, and omitted material facts, in that: (1) Figma was growing its market share and was becoming a leader in user experience design; (2) Figma was in direct competition with Adobe on user experience design; (3) Adobe's "Express" product was not an effective counter to Figma's growing market share in bringing new customers to Adobe's paid offerings; (4) Adobe's other offerings were not succeeding in competing with Figma on user experience design; and (5) Adobe was losing market share to Figma.

113.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

114.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

115.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

116.    Plaintiff, on behalf of Adobe, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

117.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

118.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Adobe.

119.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Adobe that was tied to the performance or artificially inflated valuation of Adobe or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

120.     Plaintiff, as a shareholder and a representative of Adobe, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

121.     Plaintiff, on behalf of Adobe, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

122.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.     The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

124.     As a result of the misconduct described above, the Individual Defendants wasted

corporate assets by, *inter alia*: (1) paying and collecting excessive compensation and bonuses; and (2) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and several of its current and former officers against the Securities Class Action.

125.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

126.    Plaintiff, on behalf Adobe, has no adequate remedy at law.

## FIFTH CLAIM

**Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duties**

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

129.    Plaintiff on behalf of Adobe has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.      Directing all Individual Defendants to account for and to disgorge all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.      Awarding punitive damages;

D.      Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: January 3, 2024                          Respectfully submitted,

Of Counsel:                                      **FARNAN LLP**

**THE ROSEN LAW FIRM, P.A.**                     /s/ Michael J. Farnan
Phillip Kim                                      Brian E. Farnan (Bar No. 4089)
Erica L. Stone                                   Michael J. Farnan (Bar No. 5165)
275 Madison Avenue, 40th Floor                   919 North Market St., 12th Floor
New York, NY 10016                               Wilmington, DE 19801
Telephone: (212) 686-1060                        Telephone: (302) 777-0300
Facsimile: (212) 202-3827                        Fax: (302) 777-0301
Email: pkim@rosenlegal.com                       Email: bfarnan@farnanlaw.com
Email: estone@rosenlegal.com                     Email: mfarnan@farnanlaw.com


*Counsel for Plaintiff*